IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-490

No. COA20-488

Filed 21 September 2021

Wake County, No. 17 CVS 003251

HORTENSE PAMELA HILL, Plaintiff,

v.

DAVID WARNER BOONE, M.D., and RALEIGH ORTHOPAEDIC CLINIC, P.A., Defendants.

Appeal by Plaintiff from judgment entered 17 September 2019 by Judge Stephan R. Futrell in Wake County Superior Court. Heard in the Court of Appeals 11 May 2021.

*Knott and Boyle, PLLC, by W. Ellis Boyle and Benjamin Van Steinburgh, for plaintiff-appellant.*

*Yates McLamb & Weyher, LLP, by John W. Minier and Alexandra L. Couch, for defendants-appellees.*

MURPHY, Judge.

¶ 1     Evidence regarding damages may not typically be admitted during the liability portion of a bifurcated trial pursuant to N.C.G.S. § 1A-1, Rule 42(b)(3). However, as here, when Plaintiff opened the door to evidence relevant for impeachment purposes by testifying regarding her current health condition during the liability portion of such a bifurcated trial, the opposing party was allowed to ask questions and present relevant evidence for the limited purpose of impeaching that testimony, even though

such evidence would otherwise be inadmissible due to its relation to damages. When using a videotape to impeach a party's testimony, the videotape must be properly authenticated, which was accomplished here by Plaintiff's admission that she is the person in the videotape and that the videotape portrayed a time period relevant for impeachment purposes. Finally, the trial court was not required to give a limiting instruction regarding evidence admitted for impeachment purposes in the absence of a request for such an instruction.

## BACKGROUND

Plaintiff Hortense Pamela Hill sued Dr. David Warner Boone and Raleigh Orthopaedic Clinic, P.A. (collectively, "Defendants") for malpractice arising from surgeries to her right foot. On 2 May 2014, Dr. Boone operated on Plaintiff's right foot to remedy calcaneocuboid osteoarthritis. He used a 45 mm screw, which traveled 7 to 10 mm past the bottom of Plaintiff's bone into soft tissue. When Plaintiff reported experiencing pain in different areas of her foot, Dr. Boone took an x-ray from a different angle than previous x-rays taken after surgery, discovered the screw used in the initial surgery was too long, and recommended an additional surgery. During the second surgery on 13 June 2014, Dr. Boone removed the original screw and replaced it with a 36 mm screw.

In her *Complaint* filed 15 March 2017, Plaintiff alleged Dr. Boone negligently performed the 2 May 2014 surgery, and claimed she suffers "unremitting pain in her

right foot . . . [which is] more intense after she walks for even a few feet" and that she "cannot stand more than a few minutes without severe pain in her right foot." She also claimed she could not "partake in activities she previously enjoyed such as dancing, bowling, going to the movies, being a spectator at sporting events, traveling, and walking her dog."

On 14 February 2019, Plaintiff moved to bifurcate the trial pursuant to N.C.G.S. § 1A-1, Rule 42(b)(3), which the trial court granted on 18 March 2019. The trial court's decision to bifurcate the trial is not challenged by either party on appeal.

At trial, Plaintiff testified she currently uses a scooter and that she was not using a scooter to get around in November of 2013 when she re-injured her foot or prior to that. She testified that she continues to take the same amount of nerve blocking medication because of pain in her right foot as she did in 2014, the pain decreased but never went away after the surgery, and that she could not find anything that could be done to take the pain away–"basically it *is* . . . there and that's it." (Emphasis added). On cross-examination, she also stated "[t]he toes is what I meant can't touch anything. . . . It's my big toe and my three toes next to it is what can't touch anything."

On cross-examination and over Plaintiff's objection, Defendants played and asked questions regarding an exhibit compiling videos of Plaintiff obtained via private surveillance, which "shows Plaintiff walking, visiting various stores,

navigating street curbs on her allegedly injured foot, climbing stairs, driving around town, loading her car with groceries, babysitting her grandson, pushing a stroller, and carrying her grandson while navigating curbs, among other things."

¶ 7        Plaintiff had been deposed on 30 August 2017, where she described the current condition of her foot extensively. At trial, Defendants' first reference to that deposition occurred prior to playing the videotape surveillance and during a question by Defendants about Plaintiff quitting a job in 1999, to which Plaintiff objected. After that initial reference to the deposition, Defendants showed the videotape surveillance for the purpose of impeaching her testimony; then, Defendants played a video of Plaintiff's deposition testimony where Plaintiff claimed she could not drive, walk, or wear shoes as she used to, could not walk her dog, would not be able to take her new grandchild in a stroller because she "can't walk," "[n]o one can touch [her] foot[,]" and "can't have a blanket, a sock or shoe or anything on [her] foot . . . [i]t feels like it's on fire . . . [and she is] in pain constantly." Although Plaintiff objected to the prior reference to the deposition, Plaintiff did not object to Defendants playing the video of the deposition.[1]

---

[1] The admission of the video of Plaintiff's deposition testimony is not dispositive to our analysis, as it was not admitted prior to the videotape surveillance, and did not open the door for the videotape surveillance. The videotape surveillance of Plaintiff was admitted first, so other testimony by Plaintiff would have had to open the door, and not the deposition video. *See generally State v. Smith*, 155 N.C. App. 500, 509-10, 573 S.E.2d 618, 624-25 (2002)

¶ 8      While Defendants cite the 26 March 2019 transcript to claim the deposition was introduced without objection "while cross-examining Plaintiff at trial," the introduction without objection referenced in Defendants' brief occurred on 26 March 2019, upon Defendants' re-direct examination of their own witness. While Plaintiff was on the stand, after the initial objected-to reference to the deposition and subsequent playing of the videotape surveillance, Defendants played the deposition video while cross-examining Plaintiff, without further objection. Plaintiff reaffirmed her deposition testimony, stating:

> [DEFENDANTS' COUNSEL:] And during that deposition there were a number of questions where I was asking how you were doing after Dr. Boone's surgeries?
>
> [PLAINTIFF:] Yes.
>
> [DEFENDANTS' COUNSEL:] And at that point you told me that you had to be in bed most of time, right?
>
> [PLAINTIFF:] To keep my foot up, yes.

¶ 9      Outside of the presence of the jury, the trial court allowed the videotape surveillance to be admitted for Defendants' purported impeachment purposes only.

¶ 10      During closing arguments, Defendants made the following statement regarding the videotape surveillance and Plaintiff's testimony, to which Plaintiff did not object:

---

(holding a party opens the door to impeachment through prior evidence or testimony he or she introduces), *disc. rev. denied*, 357 N.C. 255, 583 S.E.2d 287 (2003).

> You've seen the surveillance tapes, and a picture paints 1,000 words. But -- and this thing about $20,000[.00] -- $22,000[.00], how dare you spend $22,000[.00] following her around, sneaking around videoing her -- she attacked Dr. Boone and his livelihood and his profession and his integrity. And on that deposition that you saw on the video, she didn't know we were going to get all her medical records and double-check, and we were going to do surveillance and double-check. And she attacked him aggressively on that. She said she couldn't dance anymore because of his surgery. Remember that. That's pretty aggressive.
>
> *That's just a -- to attribute her ability to dance to this surgery, given all the past, is an unfair attack and goes to her credibility. That's why we showed you all that stuff.*

(Emphasis added).

¶ 11        The jury found for Defendants on liability on 29 March 2019. The trial judge entered judgment in favor of Defendants on 17 September 2019.

¶ 12        Plaintiff timely appealed pursuant to N.C.G.S. § 7A-27(b)(1) and argues the trial court improperly allowed Defendants to play the videotape surveillance, as it did not pertain to the liability portion of the bifurcated trial and was not properly authenticated. According to Plaintiff, Defendants improperly introduced the videotape surveillance as evidence and "featured" the videotape surveillance in their closing argument. Plaintiff also argues the trial court was required to give a limiting instruction regarding the videotape surveillance, and that Defendants improperly referenced the videotape surveillance in the closing of the liability portion of the trial,

implying Defendants used the videotape surveillance as substantive evidence.

## ANALYSIS

### A. Standard of Review

¶ 13        According to N.C.G.S. § 1A-1, Rule 42(b)(3):

> Upon motion of any party in an action in tort wherein the plaintiff seeks damages exceeding one hundred fifty thousand dollars ($150,000[.00]), the [trial] court shall order separate trials for the issue of liability and the issue of damages, unless the [trial] court for good cause shown orders a single trial. Evidence relating *solely* to compensatory damages shall not be admissible until the trier of fact has determined that the defendant is liable. The same trier of fact that tries the issues relating to liability shall try the issues relating to damages.

N.C.G.S. § 1A-1, Rule 42(b)(3) (2019) (emphasis added).

¶ 14        Both parties argue the standard of review is abuse of discretion for this appeal, which is incorrect. *See State v. Coleman*, 254 N.C. App. 497, 501-02, 803 S.E.2d 820, 824 (2017) (noting we apply the correct standard of review, despite an appellant's incorrect assertion of the standard of review). We note

> [t]he paramount duty of the trial judge is to supervise and control the course of the trial so as to prevent injustice. In discharging this duty, the [trial] court possesses broad discretionary powers sufficient to meet the circumstances of each case. This supervisory power encompasses the authority to structure the trial logically and to set the order of proof. Absent an abuse of discretion, the trial judge's decisions in these matters will not be disturbed on appeal.
>
> The North Carolina Rules of Civil Procedure [specifically,

Rule 42(b),] expressly preserve these inherent supervisory
powers with regard to severance and bifurcation.

*In re Will of Hester*, 320 N.C. 738, 741-42, 360 S.E.2d 801, 804 (citations omitted),

*reh'g denied*, 321 N.C. 300, 362 S.E.2d 780 (1987); *see Clarke v. Mikhail*, 243 N.C.

App. 677, 694, 779 S.E.2d 150, 163 (2015) (stating "we are asked to review the trial

court's reasoning" in denying a motion for a bifurcated trial under N.C.G.S. § 1A-1,

Rule 42(b)(3) for abuse of discretion), *disc. rev. denied*, 782 S.E.2d 892 (2016); *Webster*

*Enters., Inc. v. Selective Ins. Co. of the Southeast*, 125 N.C. App. 36, 46, 479 S.E.2d

243, 249-50 (1997) (citation omitted) ("The trial court is vested with broad

discretionary authority in determining whether to bifurcate a trial. This Court will

not superimpose its judgment on the trial court absent a showing the trial court

abused its discretion by entering an order manifestly unsupported by reason.").

¶ 15    However, Plaintiff is not arguing on appeal that the trial court erred in

granting a bifurcated trial, which would merit an abuse of discretion review. Rather,

Plaintiff argues that the videotape evidence, allowed for impeachment purposes,

pertained to damages rather than to issues of liability, and was not properly

authenticated. The proper standard of review for whether the videotape surveillance

evidence was relevant for impeachment purposes is first de novo under Rule 401.[2]

---

[2] According to Rule 607, "[t]he credibility of a witness may be attacked by any party, including the party calling him." N.C.G.S. § 8C-1, Rule 607 (2019). However, "the

*See Clarke*, 243 N.C. App. at 695, 779 S.E.2d at 163 (emphasis added) (noting, despite the trial court's denial of the motion to bifurcate under N.C.G.S. § 1A-1, Rule 42(b)(3), "[o]ur review confirms [the disputed evidence was] both *relevant* and that the trial court did not abuse [its] discretion in determining that the [disputed evidence was] not unfairly prejudicial to [the] [p]laintiff"). Accordingly, we first apply a de novo standard of review to determine whether the videotape surveillance was offered for a relevant purpose. If we determine the videotape surveillance was relevant for impeachment purposes, we typically also analyze whether it should have been excluded under Rule 403, which would be reviewed for abuse of discretion. *See Holland*, 273 N.C. App. at 266, 848 S.E.2d at 284. However, Plaintiff did not address Rule 403 in her brief, and has abandoned this argument on appeal. N.C. R. App. P. 28(a) (2021) ("Issues not presented and discussed in a party's brief are deemed abandoned.").

---

impeaching proof must be relevant within the meaning of Rule 401 and Rule 403[.]" *State v. Bell*, 87 N.C. App. 626, 633, 362 S.E.2d 288, 292 (1987) (emphasis omitted). We examine whether the videotape surveillance "was offered for a proper, relevant purpose, to wit: impeachment." *Holland v. French*, 273 N.C. App. 252, 262, 848 S.E.2d 274, 282 (2020); *see generally State v. Cherry*, 298 N.C. 86, 98, 257 S.E.2d 551, 559 (1979) ("The language of [a] statute [governing a phase of a bifurcated trial] does not alter the usual rules of evidence or impair the trial judge's power to rule on the admissibility of evidence. . . . Generally, evidence is relevant and admissible when it tends to shed any light on the matter at issue."), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980).

We also note that we review de novo whether a trial court complied with a statutory mandate, in this case the prohibition in N.C.G.S. § 1A-1, Rule 42(b)(3) of the admission of damages evidence during the liability portion of a bifurcated trial. *See In re E.A.*, 267 N.C. App. 396, 399, 833 S.E.2d 630, 632 (2019).

¶ 16        "The admissibility of evidence is governed by a threshold inquiry into its relevance. In order to be relevant, the evidence must have a logical tendency to prove any fact that is of consequence in the case being litigated." *State v. Holme*s, 263 N.C. App. 289, 302, 822 S.E.2d 708, 720 (2018), *disc. rev. denied*, 372 N.C. 97, 824 S.E.2d 415 (2019). "Trial court rulings on relevancy technically are not discretionary." *Id.* "Whether evidence is relevant is a question of law, [and] we review the trial court's admission of the evidence *de novo*." *State v. Kirby*, 206 N.C. App. 446, 456, 697 S.E.2d 496, 503 (2010).

¶ 17        Further, the correct standard of review regarding authentication of a videotape is de novo. *State v. Clemons*, 852 S.E.2d 671, 677-78 & n.3 (N.C. App. 2020); *see also State v. Snead*, 239 N.C. App. 439, 443, 768 S.E.2d 344, 347 (2015) ("A trial court's determination as to whether a videotape has been properly authenticated is reviewed *de novo* on appeal."), *rev'd in part on other grounds*, 368 N.C. 811, 783 S.E.2d 733 (2016).

¶ 18        Accordingly, we conduct a de novo review to determine whether the videotape surveillance was both relevant for impeachment purposes and properly authenticated.

¶ 19        We note it would be error under N.C.G.S. § 1A-1, Rule 42(b)(3) to allow the videotape surveillance for substantive purposes in the liability portion of the bifurcated trial. The videotape surveillance clearly depicts evidence that would

ordinarily solely be related to compensatory damages and prejudice Plaintiff's case as to liability. However, if the door was opened by Plaintiff on direct examination with testimony regarding her current health status, the videotape surveillance would be relevant for impeachment purposes. *See generally State v. Safrit*, 145 N.C. App. 541, 549, 551 S.E.2d 516, 522 (2001); *Harrison v. Garrett*, 132 N.C. 172, 176-77, 43 S.E. 594, 596 (1903). Arguments related to whether Plaintiff properly opened the door deserve close scrutiny because of the public policy expressed by our General Assembly in N.C.G.S. § 1A-1, Rule 42(b)(3)–"[e]vidence relating *solely* to compensatory damages *shall not be admissible* until the trier of fact has determined that the defendant is liable." N.C.G.S. § 1A-1, Rule 42(b)(3) (2019) (emphases added). We first address whether the video was properly authenticated because, if it was not, this would end our inquiry.

## B. Authentication of the Videotape Surveillance

¶ 20        "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C.G.S. § 8C-1, Rule 901(a) (2019). Our initial review of the transcript and exhibits reveals the videotape surveillance was not properly authenticated under typical requirements. Defendants offered no testimony from the creator of the video to show that the recording process was reliable and "that the matter in question is what its proponent claims." *See State v. Snead*,

368 N.C. 811, 814, 783 S.E.2d 733, 736 (2016) (quoting N.C.G.S. § 8C-1, Rule 901(a) (2015)).

¶ 21     However, Defendants attempted to authenticate the videotape surveillance by cross-examining Plaintiff. While playing the videotape surveillance, which portrayed Plaintiff with a time-and-date stamp on the screen, Defendants asked Plaintiff the following questions:

> [DEFENDANTS' COUNSEL:] Is this you? Is that your car?
>
> [PLAINTIFF:] Correct.
>
> . . . .
>
> [DEFENDANTS' COUNSEL:] Can you tell if that's you?
>
> [PLAINTIFF:] Yes, it's me.
>
> [DEFENDANTS' COUNSEL:] And this is a different scene
> on [16 October 2017]?
>
> [PLAINTIFF:] Yes.
>
> . . . .
>
> [DEFENDANTS' COUNSEL:] This is still you, correct?
>
> [PLAINTIFF:] Yes.
>
> [DEFENDANTS' COUNSEL:] Is that you?
>
> [PLAINTIFF:] Yes.
>
> [DEFENDANTS' COUNSEL:] On [16 October 2017]?
>
> [PLAINTIFF:] Yes.

. . . .

[DEFENDANTS' COUNSEL:] Is that you?

[PLAINTIFF:] Yes.

[DEFENDANTS' COUNSEL:] Where are you there?

[PLAINTIFF:] At Home Depot, I guess, or Lowe's. I'm not sure.

[DEFENDANTS' COUNSEL:] And this is the afternoon, according to our timestamp, of [16 October] at 2:53 p.m.[?]

[PLAINTIFF:] Yes.

[DEFENDANTS' COUNSEL:] And here's [25 October]. Is that you?

[PLAINTIFF:] Yes.

[DEFENDANTS' COUNSEL:] [25 October] at 10:23 a.m. according to the timestamp, right?

[PLAINTIFF:] Correct.

. . . .

[DEFENDANTS' COUNSEL:] Is this you here?

[PLAINTIFF:] Yes.

[DEFENDANTS' COUNSEL:] [21 December], just, for the record, 2017, 10:32 a.m. Is that you?

[PLAINTIFF:] Yes.

. . . .

[DEFENDANTS' COUNSEL:] Is this you in the New York Mets shirt?

[PLAINTIFF:] Correct.

[DEFENDANTS' COUNSEL:] [26 April 2018] according to the timestamp.

[PLAINTIFF:] Correct.

. . . .

[PLAINTIFF'S COUNSEL:] Your Honor, I raise a separate objection to (inaudible). That's her grandchild and (inaudible) I don't think that should be shown.

[THE COURT:] Overruled.

[DEFENDANTS' COUNSEL:] Is this you on [26 April 2018] at 1:20 p.m.?

[PLAINTIFF:] Yes.

[DEFENDANTS' COUNSEL:] Is that your grandchild that you're with?

[PLAINTIFF:] Correct.

[DEFENDANTS' COUNSEL:] In the stroller?

[PLAINTIFF:] Yes.

. . . .

[DEFENDANTS' COUNSEL:] Now, we're going to a new scene. Is that you?

[PLAINTIFF:] Yes.

[DEFENDANTS' COUNSEL:] Carrying your -- is that your grandchild?

[PLAINTIFF:] Yes.

[DEFENDANTS' COUNSEL:] [11 May 2018]?

[PLAINTIFF:] Yes.

[DEFENDANTS' COUNSEL:] And according to the timestamp 11:44 and now 11:45 a.m.?

[PLAINTIFF:] Correct.

. . . .

[DEFENDANTS' COUNSEL:] And any trouble carrying the grandson here?

[PLAINTIFF:] Yes, as you can see I'm limping more, a little more.

[DEFENDANTS' COUNSEL:] How old is he in May of 2018?

[PLAINTIFF:] He was born in September of [2017], so he may be about six months.

[DEFENDANTS' COUNSEL:] Do you see where he's sitting in the front of the shopping cart? Can you see that?

[PLAINTIFF:] Yes.

[DEFENDANTS' COUNSEL:] How did he get in that?

[PLAINTIFF:] I put him in there.

¶ 22    Plaintiff's confirmation that the videotape surveillance apparently portrayed her and confirmation of what the video purported to suggest was the time and date of the videos did not constitute a confirmation that the video portrayed her on those days or times, or even at a relevant time period to show her current health status. Such attempts by Defendants to authenticate the videotape surveillance via Plaintiff's admission, without more, would have been insufficient.

¶ 23        However, Plaintiff's testimony regarding her grandchild, who was with her in some of the videos, constitutes an admission regarding her health status at a relevant time period–2017 and 2018–as she admits when her grandchild was born and approximately how old he was in the video.  Plaintiff's admission regarding a depiction of her at a relevant time period vis-à-vis her health status, years after the surgery and close to the trial date, constituted an authentication of the portions of the videotape surveillance that included her grandchild, and were appropriate to use, if relevant, for impeachment purposes.[3]  *See id.* at 815, 783 S.E.2d at 737 ("Given that [the party allegedly portrayed in the video] freely admitted that he is one of the two people seen in the video stealing shirts and that he in fact stole the shirts, he offered the trial court no reason to doubt the reliability or accuracy of the footage contained in the video.").  The videotape surveillance was authenticated via Plaintiff's admissions regarding her grandchild, and we now determine whether the videotape surveillance was relevant for impeachment purposes.

**C. Relevance of the Videotape Surveillance for Impeachment Purposes**

¶ 24        A longstanding principle within our jurisprudence provides that "[t]he primary purpose of impeachment is to reduce or discount the credibility of a witness for the purpose of inducing the jury to give less weight to his testimony in arriving at the

---

[3] We note Plaintiff did not make an argument regarding the exclusion of the entire video in the event a portion is determined to be authenticated.

ultimate facts in the case." *State v. Bell*, 249 N.C. 379, 381, 106 S.E.2d 495, 498 (1959). "Impeachment evidence has been defined as evidence used to undermine a witness's credibility, with any circumstance tending to show a defect in the witness's perception, memory, narration or veracity relevant to this purpose." *State v. Gettys*, 243 N.C. App. 590, 595, 777 S.E.2d 351, 356 (2015), *disc. rev. denied and appeal dismissed*, 368 N.C. 685, 781 S.E.2d 798 (2016).

¶ 25 The opposing party can impeach a witness by offering evidence of that witness's prior inconsistent statements or dishonesty. *See Thompson v. Lenoir Transfer Co.*, 72 N.C. App. 348, 350-51, 324 S.E.2d 619, 620-21 (1985); *State v. Aguallo*, 322 N.C. 818, 824, 370 S.E.2d 676, 679 (1988) ("Prior statements by a [party] [including prior testimony] are a proper subject of inquiry by cross-examination."); *State v. Anderson*, 88 N.C. App. 545, 548, 364 S.E.2d 163, 165 (1988) (marks and citation omitted) ("[I]mpeachment is an attack upon the credibility of a witness, and is accomplished by such methods as showing the existence of bias; a prior inconsistent statement; untruthful or dishonest character; or defective ability to observe, remember, or recount the matter about which the witness testifies.").

¶ 26 "It is well-settled law in North Carolina that where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially." *Safrit*, 145 N.C. App. at

549, 551 S.E.2d at 522 (marks omitted); *see generally Harrison*, 132 N.C. at 176-77, 43 S.E. at 596. If Plaintiff opened the door to impeachment regarding her current health status via testimony on direct examination, Defendants could have impeached her with the authenticated videotape surveillance of her carrying her grandchild while walking and performing other activities on her feet.[4]

While Plaintiff did not open the door to impeachment via the claims in her *Complaint* and deposition, as argued briefly by Defendants on appeal,[5] that she was unable to drive, stand, walk, or have her foot touched due to unremitting pain, her following testimony on direct examination opened the door to further questions regarding the nature of her pain: that she currently uses a scooter after not using one before the injury and subsequent surgery; her current need to take the same amount of nerve blocking medication as she took immediately after her second surgery due to continued pain; the permanent nature of her injury and pain; and that the pain "was

---

[4] In addition to arguing the videotape surveillance only pertained to damages, Plaintiff cites an unpublished case to argue she did not open the door to impeachment via the video. *See Kosek v. Barnes*, COA 06-76, 181 N.C. App. 149, 639 S.E.2d 453, 2007 WL 3581 (2007) (unpublished). However, this unpublished case is unpersuasive, as there we deferred to the trial court's ruling to exclude certain evidence to impeach *under Rule 403* during the compensatory damages phase of a bifurcated trial. *Id.* at *2-*3. Our analysis in *Kosek* affirmed that a witness's credibility is impeachable, but such evidence must comply with Rules 401 and 403. *Id.* As acknowledged above, Plaintiff abandoned any argument regarding Rule 403.

[5] Defendants' brief includes the following statement to further the argument that the trial court properly admitted the videotape surveillance to impeach Plaintiff's testimony: "Defendants admitted into evidence and showed the jury portions of Plaintiff's videotaped deposition *without any objection from Plaintiff's counsel*."

[a] burning, numbing, tingly, aching pain where nothing could touch [her] foot." Such testimony, taken together, opened the door to questions about the nature of Plaintiff's recent and current pain on cross-examination.

In response to questions on cross-examination regarding the nature of her pain, Plaintiff testified that her toes cannot touch anything. According to Plaintiff, "[i]t's my big toe and my three toes next to it is what can't touch anything." Plaintiff's statement that her toes cannot touch anything allowed Defendants to impeach her testimony via the videotape surveillance. The videotape surveillance, which showed Plaintiff engaging in activities such as walking, lifting, navigating a curb, and opening the driver's side door of her car, was relevant to contradict her credibility, particularly her truthfulness about unremitting pain, that her toes cannot touch anything, and inferences that she needed a scooter to move after her injury and surgery. The videotape surveillance evidence was relevant for impeachment purposes under Rule 401. The trial court did not err in allowing Defendants to play the videotape surveillance for the jury while impeaching Plaintiff's testimony.

## D. Lack of a Limiting Instruction

Plaintiff argues the trial court was required to give a limiting instruction regarding the videotape surveillance and cites *State v. Strickland* to support her argument. *State v. Strickland*, 276 N.C. 253, 173 S.E.2d 129 (1970). According to *Strickland*,

> [a]side from the constitutional and procedural questions here presented, we think it appropriate to observe that the use of properly authenticated moving pictures to illustrate a witness' testimony may be of invaluable aid in the jury's search for a verdict that speaks the truth. However, the powerful impact of this type of evidence requires the trial judge to examine carefully into its authenticity, relevancy, and competency, and–if he finds it to be competent–to give the jury proper limiting instructions at the time it is introduced.

*Id.* at 262, 173 S.E.2d at 135.

At the time Defendants introduced the video while cross-examining Plaintiff, her counsel objected, and the trial court overruled the objection. The trial court did not give a limiting instruction. Rather, the trial court's subsequent references to the videotape surveillance stated it was for impeachment purposes only, but those references occurred outside of the presence of the jury. Plaintiff did not request the jury be given a limiting instruction. Plaintiff argues the trial court committed reversible error by not *sua sponte* issuing a limiting instruction regarding the video. This is not the law in North Carolina.

Our Supreme Court has held "[t]he trial court is not required to instruct the jury with respect to evidence . . . in the absence of a request to do so." *Williams v. Bethany Volunteer Fire Dept.*, 307 N.C. 430, 435, 298 S.E.2d 352, 355 (1983) (holding that, where they failed to request a limiting instruction, "[parties] cannot [] complain [on appeal] that they were hurt by the introduction of evidence whose thrust they

may have been able to limit"). "The admission of evidence which is competent for a restricted purpose without limiting instructions will not be held [to be] error in the absence of a request . . . for such limiting instructions." *Holland*, 273 N.C. App. at 267, 848 S.E.2d at 285; *see also State v. Whitley*, 311 N.C. 656, 664, 319 S.E.2d 584, 589 (1984) ("The admission without limitation of evidence which is competent for a restricted purpose will not be held to be error in the absence of a request . . . for limiting instructions."); *State v. Maccia*, 311 N.C. 222, 228-29, 316 S.E.2d 241, 245 (1984) ("Although it is true that the jury was not instructed in the present case to limit its consideration of the evidence to purposes of impeachment, it does not appear from the record that the defendant requested a limiting instruction. The admission of evidence which is competent for a restricted purpose will not be held error in the absence of a request by the defendant for limiting instructions."); *State v. Handsome*, 300 N.C. 313, 319, 266 S.E.2d 670, 675 (1980) ("[W]here the defendant does not request that the limiting instruction be given, as he did not in this case, it is not error when the instruction is not given."). As Plaintiff did not request a limiting instruction, the trial court did not commit error by not issuing a limiting instruction regarding the videotape surveillance.

**E. Reference to Videotape Surveillance in Defendants' Closing Argument**

Finally, Plaintiff argues Defendants improperly referenced the videotape surveillance in closing, implying Defendants used it as substantive evidence. During

closing, Defendants stated:

> [DEFENDANTS' COUNSEL:] . . . . You've seen the surveillance tapes, and a picture paints 1,000 words. But -- and this thing about $20,000[.00] -- $22,000[.00], how dare you spend $22,000[.00] following her around, sneaking around videoing her -- she attacked Dr. Boone and his livelihood and his profession and his integrity. And on that deposition that you saw on the video, she didn't know we were going to get all her medical records and double-check, and we were going to do surveillance and double-check. And she attacked him aggressively on that. She said she couldn't dance anymore *because of his surgery.* Remember that. That's pretty aggressive.
>
> That's just a -- to attribute her ability to dance to this surgery, given all the past, *is an unfair attack and goes to her credibility. That's why we showed you all that stuff.* But, to finish my discussion on the law, before we get all that -- and I want to show you that videotape again, so you will understand how aggressive the attack was and why the fight back from the defense was proportionate. It was appropriate. This is the second half of the law. I told you that standard of care.
>
> [PLAINTIFF'S COUNSEL:] Objection, Your Honor. This is beyond the jury instructions.

(Emphases added).

¶ 33    Plaintiff did not object to Defendants' reference to the videotape surveillance during closing, but rather objected to a later reference to the standard of care and the law. Plaintiff's argument regarding Defendants' reference to the videotape surveillance during closing is not preserved for appeal. *See* N.C. R. App. P. 10(a)(1) (2021) ("In order to preserve an issue for appellate review, a party must have

presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context."); *State v. Thompson*, 265 N.C. App. 576, 586, 827 S.E.2d 556, 563 (2019) (holding that a party fails to preserve for appellate review a challenge to remarks made during closing argument in the absence of an objection).

## **CONCLUSION**

The videotape surveillance of Plaintiff was authenticated by her admission that she was both the subject of the videotape and that she was carrying her grandchild at a relevant period of time. The videotape surveillance was used for a proper purpose when Plaintiff opened the door to impeachment through her testimony regarding the current nature of her injury, and the videotape surveillance was relevant for impeachment purposes, as it related to Plaintiff's credibility as a witness. The trial court was not required to give a limiting instruction regarding the videotape surveillance when Plaintiff did not request such an instruction, and Plaintiff waived her challenge to Defendants' reference to the videotape surveillance in closing by not objecting to such a reference.

AFFIRMED.

Judges ZACHARY and CARPENTER concur.